# EXHIBIT 2

IN THE MATTER OF

JAMS Case Number: <u>1100118664</u>

BETWEEN:

YAHYA IMAD

CLAIMANT

and

PAYWARD INTERNATIONAL MARKETS LIMITED, d/b/a KRAKEN

RESPONDENT

**<u>FINAL AWARD</u>**

Arbitrator

Ryan Abbott

18 October 2025

1

1. SUMMARY

    1.1. Respondent Kraken ("Respondent" or "Kraken") provides a platform to buy and sell digital assets. Claimant had been a user of Respondent's services since 2018.

    1.2. On 25 November 2024, a third-party (the "Thief") accessed Claimant's account with Respondent (the "Kraken Account") and converted and stole assets belonging to Claimant (the "Theft").

    1.3. Claimant alleges that Respondent is liable for the Theft under various theories. Respondent denies any liability.

    1.4. For the reasons discussed below, while Claimant's loss is deeply unfortunate, he has not provided sufficient evidence to support that Respondent is liable for damages under any theory he had advanced.

2. Factual Background

    2.1. Parties

        2.1.1. Claimant Yahya Imad is a Romanian resident and user of Respondent's services.

        2.1.2. Respondent Payward International Markets Limited, doing business as Kraken, is a wholly owned subsidiary of Payward, Inc., based in the British Virgin Islands. Respondent operates a cryptocurrency exchange in Romania and other European Economic Area countries, which offers an exchange platform to buy and sell digital assets such as Bitcoin and Ethereum ("ETH") through online and mobile app interfaces.

        2.1.3. Claimant and Respondent each a "Party" and collectively the "Parties".

    2.2. Undisputed Facts

        2.2.1. Claimant opened a Kraken account on January 8, 2018, and accepted Kraken's then operative terms of service. The Parties have stipulated that the Terms of Service in effect on 25 November 2024 apply to the present dispute (the "Terms of Service").

            2.2.1.1. Among other things, the Terms of Service: 1) require account users to maintain the security of their accounts and accept the risk of unauthorized activity, 2) state that Kraken is not a fiduciary or depository institution, and 3) contain an exculpatory clause. The Terms of Service state they constitute the entire agreement between the Parties.

2

    2.2.2. Kraken provides various account-level security tools, such as hashed passwords and email authentications, as well as optional advanced security features such as two-factor authentication.

    2.2.3. On 25 November 2024, a Thief accessed the Kraken Account and stole the funds therein. This was promptly reported by Claimant to Kraken.

        2.2.3.1. Among other details, the Thief, using a device with an IP address in Sweeden, added a new withdrawal address, converted Claimant's fiat and digital assets not already in ETH into ETH, and withdrew the entire balance of approximately 54 ETH.

        2.2.3.2. No hold was placed by Kraken related to this activity and no two-factor authentication (2FA) was required.

3. Arbitration Procedural History

    3.1. On or about 30 January 2025, Claimant filed an initial demand that was uploaded to JAMS Access. On 19 February 2025 and 7 March 2025, second and third demands were uploaded. On 24 April 2025, a fourth demand was uploaded.

    3.2. Arbitration was commenced on 26 February 2025 when JAMS issued a Letter of Commencement.

    3.3. Respondent was initially unresponsive, and Claimant advanced arbitration fees. Claimant subsequently filed a request for default which Respondent opposed.

    3.4. A preliminary hearing was conducted by Zoom on 12 May 2025, pursuant to written notice. Both Claimant in a pro se capacity and counsel for Respondent participated in the preliminary hearing ("Preliminary Hearing").

    3.5. On or about 12 May 2025, the Arbitrator issued Order No. 1 denying the request for default for the reasons provided and directing Respondent to reimburse Claimant for all relevant advanced arbitration fees.

    3.6. On or about 15 June 2025, the Arbitrator issued Order No. 2, which among other things, noted a stipulation by the Parties that the Terms of Service applied, agreed a protective order, and provided a stipulated briefing schedule for expert reports and briefings.

    3.7. On or about 19 July 2025, the Arbitrator issued Order No. 3 amending the schedule.

    3.8. Each Party submitted briefings and expert reports, all of which were carefully reviewed and considered by the Arbitrator.

4. Agreement to Arbitrate

4.1. The Parties agree there is an enforceable arbitration clause contained within Respondent's terms of service. The Parties agreed there is no dispute to the arbitrability of this matter.

5. Applicable Law and Rules

   5.1. The Parties agree that the JAMS International Arbitration Rules (the "Rules") apply.

   5.2. JAMS previously determined that the JAMS Policy on Consumer Arbitration Pursuant to Pre-Dispute Clauses Minimum Standards of Procedural Fairness applies.

6. Party Arguments: Claimant's Arguments

   6.1. The Parties made a variety of factual and legal submissions throughout the course of this Arbitration. This Section and the following Section of the Award highlight certain key submissions which the Arbitrator found more relevant or persuasive. However, all Party submissions provided in writing or made orally during hearings were reviewed and considered by the Arbitrator in making this Award.

      6.1.1. For the avoidance of doubt, the Arbitrator considered all the expert reports provided, notwithstanding the various objections. Contrary to Claimant's arguments, the Arbitrator did not find the expert report by Respondent untimely, and Respondent's arguments about Claimant's expert reports go to weight, relevance, or credibility rather than admissibility.

   6.2. Claimant's Factual Arguments

      6.2.1. Kraken failed to detect and block suspicious login attempts from foreign IP addresses.

      6.2.2. Kraken failed to prevent unauthorized withdrawals to newly added withdrawal addresses.

      6.2.3. Kraken failed to notify Claimant of the relevant events in a timely and effective manner.

      6.2.4. Kraken publicly advertises mandatory protections like 2FA and 72-hour holds that should have applied, as well as fraud/AML review.

         6.2.4.1. More specifically, Kraken did not send the required device approval email, a new withdrawal address approval email, a mandatory 24-hour hold on new withdrawal addresses, a 72-hour hold on fiat/crypto conversions, 2FA, or fraud/AML review.

      6.2.5. Kraken instead blocked Claimant's attempted logins while an attacker's Swedish based device was allowed to complete the Theft.

4

6.2.6. Claimant's experts show breach of AML, consumer protection and securities duties, and gross negligence.

6.2.7. Kraken's email noted "Nov 25 was your busiest trading day of the year," acknowledging unusual activity.

6.2.8. Respondent concedes it does not retain automated notification emails. Respondent's logs also have a 21-minute unexplained gap during which time Claimant was attempting to login.

6.2.9. Claimant's Yahoo logs show no external access.

6.2.10. Claimant submits three reports by Mr. Christos Pitsoulis and one expert report by Ms. Karolina Maciuleviciute, confirming Kraken's AML/security failures.

6.2.11. Respondent failed to stop a suspicious transaction, despite the use of a new device with foreign IP address, no 2FA, immediate full-balance conversion and withdrawal, and a newly added wallet address.

6.2.12. Based on the evidence submitted, there is no evidence of access to the Yahoo Account. Respondent has no proof automated notification emails were sent, and Respondent recognized the unusual level of activity.

6.3. Claimant's Legal Arguments

6.3.1. Kraken is liable for breach of contract

6.3.1.1. Among other things, Kraken failed to apply a 72-hour withdrawal hold as required by their policies.

6.3.2. Kraken is liable for negligence or gross negligence

6.3.2.1. Kraken failed to prevent simultaneous foreign logins, failed to trigger any alerts for new withdrawal addresses or large transfers, blocked Claimant's legitimate login, violated its 72-hour withdrawal hold policy, and failed to investigate or halt suspicious activity in real time.

6.3.3. Claimant alleges numerous regulatory violations, including related to provisions of the Electronic Funds Transfer Act (EFTA), the Federal Trade Commission Act (FTCA), the Gramm-Leach-Bliley Act (GLBA), the Bank Secrecy Act (BSA), the Payment Services Directive 2 (PSD2), the General Data Protection Regulation (GDPR), the Anti-Money Laundering Directive 5 (AMLD5), Directive 93/13/EEC, as well as provisions of California law (Civil Code Section 1668, Consumer Legal Remedies Act [CLRA], Unfair Competition Law [UCL] Bus. & Prof. Code Section 17200), as well as JAMS Arbitration Rules. In sum, these violations required

5

       Kraken to refund unauthorized transactions, enforce 2FA and withdrawal holds, safeguard customer data and logs, apply AML/fraud checks, and refrain from disclaimers of gross negligence.

6.4. Claimant seeks in excess of 1.3M USD in damages, including: $190,000 for recovery of the value of the ETH at the time of the incident; $300,000 for emotional distress and psychological harm; $150,000 for disrupted business opportunities and time value of money; $600,000 for punitive damages due to Kraken's gross negligence; $5,000 for legal and arbitration costs; $100,000 as a penalty for regulatory violations; and $8,000 for Kraken's delaying payment of JAMS fees.

    6.4.1. Claimant also seeks restitution, pre- and post-award interest, full reimbursement of arbitration costs and expert fees, and various injunctive relief.

7. Party Arguments: Respondent's Arguments

  7.1. Respondent's Factual Arguments

    7.1.1. Claimant failed to secure his email account. The responsibility to do so fell squarely on Claimant.

      7.1.1.1. Claimant did not change his email password since 2014, and his email address had been involved in numerous data breaches since then including a hack related to CoinMarketCap in 2021 which leaked email addresses.

    7.1.2. The Thief accessed Claimant's Yahoo account on 25 November 2024 and searched for words such as "Kraken."

      7.1.2.1. Contrary to Claimant's expert Mr. Pitsoulis' report, evidence of a successful Yahoo Account login is clearly present in the logs provided by Claimant.

    7.1.3. The same Swedish IP address that compromised the Yahoo Account then logged into Claimant's Kraken account using Claimant's username and password.

    7.1.4. Kraken sent an automated device approval to the Yahoo Account which was promptly approved. Evidence of this comes from Respondent's automated logs.

    7.1.5. The Thief added a new withdrawal address and approved another Kraken automated email to the Yahoo Account to permit this.

    7.1.6. More than 39 ETH valued at more than $133,000 were withdrawn to the new withdrawal address. Additional assets belonging to Claimant were then converted to ETH and promptly withdrawn to the new withdrawal address.

6

7.1.7. Kraken had no obligation to block foreign IP addresses from accessing Claimant's Kraken Account. Claimant has provided no legal support for such an obligation, and it is not industry standard. Claimant himself has used nearly fifty unique IP addresses, associated with a variety of different countries.

7.1.8. The withdrawals were approved by the Yahoo Account and did not violate Kraken's withdrawal hold policies

   7.1.8.1. Claimant himself had made prior large withdrawals, including some in close succession, and has previously added numerous new withdrawal addresses.

      7.1.8.1.1. The 72-hour hold policy did not apply in such circumstances, which even Claimant's experts concede.

7.1.9. Kraken provided notifications to the Yahoo Account. Kraken does not retain automated emails, and it would be expected the Thief would delete such emails.

7.1.10. Contrary to Claimant's factual claims, he did not log into his Kraken account until 14:09 UTC and did not call Kraken until 14:20 UTC, more than an hour after the attack occurred and the withdrawals were already irreversible at this time.

7.2. Respondent's Legal Arguments

   7.2.1. California law applies to this Arbitration.

   7.2.2. There is no breach of contract.

      7.2.2.1. Claimant has identified no breached provision of the Terms of Service. Kraken has no contractual obligation to maintain security measures. The 72-hour withdrawal hold policy is not in the Terms of Service and does not apply anyway.

   7.2.3. There is no liability for negligence or gross negligence.

      7.2.3.1. Claimant has failed to allege facts showing an extra-contractual duty of care, which would be contrary to the Terms of Service. *See Berk v. Coinbase, Inc.*, 840 F. App'x 914, 915–16 (9th Cir. 2020); *Archer v. Coinbase, Inc.,* 53 Cal. App. 5th 266, 278 (2020).

      7.2.3.2. Claimant has not established any industry standard that Kraken failed to implement. Kraken did send automated emails, and Claimant could have used 2FA for his account but he elected not to. In any case, the Terms of Service supersede any industry standard.

      7.2.3.3. Regardless, there were no simultaneous logins, the Yahoo Account provided required verifications, Claimant's logins were not blocked, the 72-

7

  hour withdrawal hold policy did not apply, and Kraken promptly investigated the attack.

 7.2.3.4. Causation for Claimant's loss rests with Claimant and the Thief.

 7.2.3.5. The economic loss doctrine bars tort liability for pure economic loss. *Pearl v. Coinbase Global, Inc.*, No. 22-cv-03561, 2024 WL 3416505, at *6 (N.D. Cal. July 15, 2024)

 7.2.3.6. Gross negligence cannot be disclaimed under California law, but Kraken was not negligent or grossly negligent.

7.2.4. U.S. regulations do not apply here.

 7.2.4.1. "The Bank Secrecy Act ("BSA"), Gramm-Leach-Bliley Act ("GLBA"), the Electronic Fund Transfer Act ("EFTA"), and Section 5 of the Federal Trade Commission Act ("FTCA") do not extend to Claimant's (a Romanian citizen) claims against Kraken (a British Virgins Islands entity). These regulatory acts are limited in scope to entities located or operating in the United States. The BSA, 31 U.S.C. §§ 5311–5332, applies to "financial institutions" as defined in 31 U.S.C. § 5312(a)(2), which are generally those operating in the United States. The implementing regulations (31 C.F.R. Chapter X) apply to institutions "doing business in the United States." Regulation E, which implements the EFTA, is limited to "any account located in the United States through which EFTs are offered to a resident of a state." Comment for 12 C.F.R. ¶ 205.3(a)-3. The regulation itself specifically exempts foreign branches of U.S. financial institutions "unless the . . . services are offered in connection with an account in a state." A "state" is "[a]ny of the several States of the United States of America, its territories, the District of Columbia, and the Commonwealth of Puerto Rico." Respondent's Hearing Brief, 38–9.

 7.2.4.2. The BSA, GLBA, FTCA, and AMLD do not create a private cause of action or tort duty.

 7.2.4.3. Article 33 of the GDPR does not apply. It requires a data controller notify a supervisory authority within 72 hours of becoming aware of a "personal data breach." Claimant cannot establish either a personal data breach or any obligation to inform him under Art 33.

 7.2.4.4. Article 34 requires a report without undue delay, but Claimant was aware of the breach before Kraken.

 7.2.4.5. PSD2 is a Directive, and it does not cover cryptocurrency transactions.

 7.2.4.6. EFTA claims are barred on the basis of extraterritoriality, transfer errors cannot be corrected, does not apply to cryptocurrency investing, and there is no "account" or "electronic funds transfer" within the meaning of EFTA. In any

   event, Claimant could not show his losses were the result of any failure by Kraken.

 7.2.5. Claimant's requested damages are disclaimed by the Terms of Service which prohibits recovery for "any indirect, incidental, special, consequential, or exemplary damages, including damages for loss of profits" or "diminution in value." Such clauses are enforceable. See, e.g., Chinese Hosp. Ass'n v. Jacobs Eng'g Grp., Inc., 2019 WL 6050758, at *3, *5 (N.D. Cal. Nov. 15, 2019). The Terms of Service also limits recovery to $100, which is also enforceable. *Lewis v. YouTube, LLC*, 244 Cal. App. 4th 118, 126 (Cal. Ct. App. 2015).

  7.2.5.1. Punitive damages are not available under contract, and there has been no showing by clear and convincing evidence that Kraken is guilty of oppression, fraud, or malice.

  7.2.5.2. Claimant's damages are speculative, and speculative damages awards are not allowed under California law.

  7.2.5.3. Damages are limited by Claimant's comparative negligence.

  7.2.5.4. Declaratory relief and injunctive relief are not applicable.

 7.2.6. Claimant's expert reports are inadmissible.

  7.2.6.1. Both experts are unqualified. Neither relied on sufficient data or facts. Neither expressed relevant opinions. The proffered opinions are unreliable and often incorrect.

8. Findings

 8.1. Relevant Factual Findings

  8.1.1. A Thief accessed Claimant's Yahoo Account.

   8.1.1.1. The Parties disagree about whether a Thief accessed the Yahoo Account, however Respondent has shown the account had been involved in numerous data breaches, and there is direct evidence in the Yahoo technical logs of an unauthorized takeover.

   8.1.1.2. Claimant has provided insufficient evidence to show this was not the case, or to support an alternative explanation as to how the Theft could have occurred such as Kraken's systems having been compromised.

  8.1.2. Kraken adhered to its security protocols.

   8.1.2.1. Claimant argues certain approvals were not sent, but given the Thief had access to the Yahoo Account, and those approvals would have been sent solely

9

       by email to the Yahoo Account, it is probable these were promptly deleted by the Thief. Although Respondent denied retaining automated emails, there is evidence from Respondent's internal logs that the emails were sent.

            8.1.2.1.1.    Similarly, Claimant has provided no evidence of any applicable security measure (e.g., 2FA, required holds) that Respondent's policies required but that was not applied.

       8.1.2.2.    Claimant similarly did not submit evidence sufficient to prove that Kraken blocked his logins. The evidence also shows that that this would not have prevented the already completed Theft, as he first attempted to login after the Theft was complete.

8.2. Relevant Legal Findings

    8.2.1.    There is no evidence of breach of the Terms of Service

       8.2.1.1.    Claimant does not point to a specific term or condition of the Terms of Services that he can show Kraken violated.

    8.2.2.    There is no evidence of negligence or gross negligence by Kraken

       8.2.2.1.    Claimant has failed to meet his burden of showing any negligence by Kraken. He has not provided a sufficient legal basis to find Kraken owed him a duty to prevent his account takeover or that industry standard security measures were not implement, he has not proven the factual claims underlying his breach allegations, and he has not proven proximate causation.

    8.2.3.    There is no evidence of a violation of any relevant regulatory violation that would give rise to an award of damages here.

       8.2.3.1.    Claimant alleged many different regulatory violations, but in a cursory manner without a detailed description of why the specific regulations had been violated, why they applied to the Theft, the rights and remedies that would apply here given the specific alleged regulatory violation, or sufficient legal support for those claims or to rebut Kraken's arguments to the contrary.

            8.2.3.1.1.    For example, AML compliance is not a basis for damages, and the BSA and AMLD in relevant part are to prevent money laundering and to prevent Kraken's customers from using the platform to break laws.

            8.2.3.1.2.    Claimant has not shown that any of the BSA, Gramm-Leach-Bliley Act, FTCA, EFTA, AMLD, GDPR, and PSD2 would support Claimant's requested relief. These regulatory frameworks either do not apply to Kraken, do not create a private right of action, do not apply to the transactions at issue, or simply are not relevant.

        8.2.3.1.3.      For UCL and CLRA claims, Claimant has not shown that Kraken failed to apply advertised protections or that this was an unlawful and unfair practice. Also, CLRA does not apply to digital assets. *See Pearl v. Coinbase Glob., Inc.*, No. 22-CV-03561-MMC, 2024 WL 3416505, at *5 (N.D. Cal. July 15, 2024).

    8.2.4.   The Arbitrator does not decide here whether Kraken's alleged disclaimers and liability caps apply, given they are irrelevant based on the lack of support for damages. Whether, for instance, Kraken can limit liability contractually or otherwise for acts of gross negligence—there was inadequate evidence submitted to support a finding of gross negligence by Kraken.

9. FINAL AWARD

   9.1. Claimant's requested relief is denied and the Award is entered in favor of Respondent.

   9.2. This Final Award is in full settlement of the merits of all claims and issues submitted to this arbitration. All claims, defenses, and contentions not expressly granted herein are denied.

IT IS SO ORDERED

Made on this 18th day of October 2025.

Signed:

*Ryan Abbott*

Ryan Abbott

Arbitrator